IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH **XIULURUAN@YAHOO.COM** THAT IS STORED AT PREMISES CONTROLLED BY YAHOO, INC. | Case No. 15-CR-00088-CG |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Amy E. White, being first duly sworn, hereby depose and state as follows:

1.      I make this affidavit in support of an application for a search warrant for information associated with **XIULURUAN@YAHOO.COM,** an account that is stored at premises controlled by Yahoo, Inc., an e-mail provider headquartered at 701 First Avenue, Sunnyvale, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Yahoo, Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since January 21, 1997.  During this time I have investigated multiple Federal violations which utilized e-mail accounts and internet service providers as a means of perpetrating the crime.  I have investigated a variety of white collar offenses to include money laundering, wire fraud, mail fraud, fraud against the government, public corruption and healthcare fraud.  I have received specialized FBI training regarding methods and techniques used in the investigation of

cybercrimes.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.      On April 30, 2015, Dr. Xiulu Ruan and his business partner, Dr. John Patrick Couch, were indicted on charges of (1) conspiracy to unlawfully distribute and dispense Schedule II controlled substances outisded the usual course of professional practice and not for a legitimate medical purpose; and (2) conspiracy to commit healthcare fraud.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

**JURISDICTION**

4.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**OVERVIEW OF THE INVESTIGATION**

5.      **Doctors John Patrick Couch and Xiulu Ruan operated two pain clinics in Mobile,** Alabama, both of which went by the name Physician's Pain Specialists of Alabama (hereinafter "PPSA").  PPSA was a pain management medical practice that provided medical care and treatment.  PPSA treated patients who have both private and federally-funded health insurance, as well as patients with workers compensation coverage.

6.      Based on source reporting, both FBI-Mobile and DEA-Mobile began independent investigations into crimes alleged to be occurring at PPSA.  In 2014, there investigations were combined into a joint investigation.

2

7.      During the course of the investigation, agents with the FBI and the DEA gathered evidence in numerous ways, including through an earlier search warrant for Dr. Ruan's e-mail content.  On October 30, 2014, Yahoo! complied with this Courts warrant and provided the United States with Dr. Ruan's e-mail content through October 22, 2014.   E-mails produced pursuant to the earlier search warrant included significant evidence of the offenses alleged in the Indictment.

## OVERVIEW OF FACTS

8.      The following facts are set out to establish that there is probable cause that there will be evidence, instrumentalities, and fruits of the crimes alleged in the Indictment found in the contents of Dr. Ruan's e-mails post-October 22, 2014.  This is not meant to be a full recessitation of facts learned during this investigation:

9.      Of all medical practitioners in Alabama registered with the DEA to purchase controlled substances in 2013, Dr. Ruan was the #1 purchaser of oxycodone and morphine.  He out-purchased the #2 purchaser of these drugs by 62% and 61%, respectively.  Also in 2013, amongst all DEA-registered practitioners in Alabama, Dr. Ruan was the #3 purchaser of fentanyl, #4 purchaser of hydrocodone and the #5 purchaser of methadone.  Furthermore, Dr. Ruan was the #4 purchaser of oxycodone and the #6 purchaser of morphine in the entire United States.  All of these drugs are Schedule II controlled substances.

10.      Of the medical practitioners in Alabama registered with the DEA to purchase controlled substances in 2014, Dr. Ruan was the #1 purchaser of oxycodone, morphine, and Fentanyl.   Furthermore, Dr. Ruan was the #3 purchase of morphine, the #5 purchaser of Fentanyl, and the #6 purchaser of both oxycodone and hydrocodone in the entire United States.

11.     Data received from the Alabama Prescription Drug Monitoring Program (PDMP) for the calendar years 2012–2014 show that Dr. Ruan prescribed approximately 31,407 prescriptions for controlled substances in 2012.  Based upon a 260 day work year and an eight hour work day, this equals approximately one controlled substance prescription written every four minutes.   In 2013, Dr. Ruan wrote approximately 30,560 controlled substances prescriptions, again equaling approximately one prescription written every four minutes.   In 2014, Dr. Ruan wrote approximately 34,883 prescriptions for controlled substances equaling approximately one prescription written every three and a half minutes.

12.      Based on my investigation, I have learned that Dr. Ruan is an extreme outlier with regard to the numbers of controlled substances ordered and prescriptions written.

13.     Based on evidence gathered during the course of this investigation, I have learned that a significant portion of PPSA "patients" receiving prescriptions for controlled substances have no legitimate medical need for the prescriptions.  These "patients" appear to be pill seekers who either abuse themselves and/or distribute the controlled substances to others.

14.     In addition, two physician's extenders at PPSA, were abusing the drugs on-site. By early 2015, at least two physician's extenders were admitted into in-patient drug rehab programs.

15.     Despite operating as a pill mill, Dr. Ruan took a variety of steps to disguise this fact.   As can be seen in this e-mail that Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, sent Dr. Couch at 12:02 AM on July 8, 2014, they were both very cognizant of the need to be cautious:

> *Pat, have you been watching the news?  AL is the leading state*
> *with the most opioid Rx written!  I noticed you have quite a few pts*
> *on Roxicodone 30 mg tid-qid prn, and Oxycontin 80 mg.  Based on*

> the diversion study done in FL pill mills, these two are the mostly thought of in South FL, therefore considered biggest reg flag. I think you should talk to Justin on cutting down Roxicodone 30 mg usage, especially we are trying to convince AL board of medical examiners that we have a great system to keep pts satisfied, and addicts out. We don't want Roxicodone 30 mg mess things up, or at least contradicts to what we promote. I believe I have two pts on oxycodone 30 mg, one of them is a W/C, cannot handle all others. Also, try to use Oxycontin 60 mg instead of 80 mg may also help. Now, everyone in the nation knows that AL state prescribes the most pain killers in the nation, we will need to adjust our routine regimen a bit. One of the things I have done is to wean off on Benzo, or ask their PCP to write their Benzo, as Benzo prescription is also one of the things they look at and. We would rather be careful than sorry.

16.     Similarly, on October 14, 2014, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, sent the following e-mail to Dr. Couch regarding a conversation with another person about insulating PPSA should it become known what was actually occurring at the clinics:

> I discussed with Boe if there are any ways of restructuring PPSA, so that neither Dr. Chen nor I can be involved, in case your team gets investigated, or something bad happens down the road. Just two weeks ago, you mentioned to me that we were supposed to be raided by FBI, which got you concerned, but thanks god, it did not happen. . . .
>
> Let's make a paper agreement between you and me, if you were out, or if I were out, the other party takes over the leaving party's business until the leaving party comes back, for whatever reason.
>
> Both of us will need to set a perfect examples for others including our mid levels, we know they are loyal, every practice can get into trouble, when there are opportunities for whistle blowers to gain. . . .
>
> Also, I do feel we need to have an alternative to minimize each individual's liability when one partner is involved.

5

## HEALTHCARE FRAUD CONSPIRACY CHARGE

17.    Dr. Couch and Dr. Ruan are also involved in a multi-faceted healthcare fraud conspiracy.  The overall objective of this conspiracy is to increase the amount of health insurance provider reimbursements received by PPSA, and thus Dr. Couch and Dr. Ruan.

18.    Source 1 explained that most PPSA patients are subjected to UDTs to determine the drugs in the patient's system.  These tests are often legitimately performed to determine whether a patient is actually taking the pain medication prescribed to them.  If the prescribed medication is not showing up in the patient's system, this may indicate the patient is selling the prescription medication.

19.    Source 1 reported that PPSA routinely orders UDTs through an outside lab that pays Dr. Ruan kickbacks based upon the number of UDTs they each refer.  Source 1 advised that Dr. Ruan has made numerous statements about this kickback scheme such as: he sends out as many UDTs as possible because the more he refers, the more money he gets paid; that he wants to maximize his payments by referring as much UDT business as he can to these labs; he implemented a policy at PPSA that requires all UDTs to be sent to outside labs after they are tested in-house regardless of the results; he instructed his staff to exclusively use Castle Laboratories (hereinafter "Castle") for UDTs in or around February 2013, because Castle agreed to pay him enough money to handle PPSA's business exclusively; and that the "deal" with Castle required Dr. Ruan to send a minimum number of samples for testing each week and/or each month in order for him to receive kickbacks.  Source 1 stated that this fraudulent practice results in numerous UDTs being referred to Castle for expensive and unnecessary testing for the sole purpose of increasing the doctors' revenue and not for a legitimate medical purpose.

6

Furthermore, Source 1 advised that PPSA staff members continued to prescribe excessive amounts of controlled substances and do not even look at the UDT test results.

20.      The allegations are corroborated by e-mail evidence obtained pursuant to a search warrant.  The following are some examples: On January 15, 2013, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, received the following e-mail from an individual whose family member was associated with Castle Medical:

> *The Castle Medical team was able to inject roughly an additional three to five million dollars a year in found revenue for the practice.  This was accomplished by drafting an aggressive wholesale direct bill arrangement between Castle Medical and the practice for urine drug confirmation testing.  I welcome the opportunity to discuss this with Dr. Ruan, via a lunch or even a dinner meeting, where we can see if our interests align in a mutually beneficial relationship.*

21.      On December 12, 2013, a Castle Lab employee sent the following e-mail to an individual, who then forwarded it to Dr. Couch and Dr. Ruan at xiuluruan@yahoo.com:

> *During the period from October 22, 2013 through December 11, 2013, the PPSA's Springhill office has discarded a total of 112 urine specimens. The average profit is $755 per specimen, therefore the 112 specimens represent a lost profit of $84,560.00.  Throughout the day, we check the EMR to determine if an order has been placed.  If an order has not been placed for a "panel" by the end of the day, we refrigerate the specimen overnight and check the EMR again in the morning.  If an order has not been placed, the specimen is discarded.*

Thereafter, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, e-mailed Dr. Couch and reminded him, "*As you know, UDS pays nothing (cost only), GC/MG is what generates revenue and we already got the urine samples.*"

### PHARMACEUTICAL KICKBACK SCHEME

22.      Dr. Ruan is also involved in a massive pharmaceutical kickback scheme.

23.      An FBI investigation identified a scheme wherein Company A paid illegal kickbacks to doctors across the country based upon the amount of controlled substances they prescribed.

24.      A former Company A employee, explained that Company A forms management contracts with doctors for dispensing drugs in their practices.  Company A manages the in-house pharmacy and bills for the drugs, and then Company A splits the billing profits with the prescribing doctors per their contract.  Typically, the profit split is 50/50; however, if the doctor agrees to also use Company A for services such as toxicology (*i.e.*, urine drug tests) the profit split could be adjusted.

25.      The scheme worked like this:  Company A supplied drugs to participating doctors with no upfront cost.  Doctors were given formularies suggesting which drugs to prescribe to maximize profits.  The doctors then prescribed the drugs, and Company A billed the patient's insurance provider.  Company A collected the insurance reimbursement and then split the money with the doctor.  Company A continuously reviewed how much each doctor billed.  If a doctor did not meet certain thresholds, than the guaranteed monthly payment to that doctor would possibly be lowered.  Conversely, if a doctor exceeded certain thresholds, that doctor would be paid more than the monthly guaranteed amount.

26.      One of the owners of Company A admitted that the reason Company A set up the payment sharing as it did was in an attempt to avoid the appearance of paying kickbacks.  He further admitted the various contracts between his businesses and participating doctors were

8

attempts to disguise kickbacks as payments for its contractual relationships; all of the contracts were for the sole purpose of paying kickbacks for the referral of patients, services and ancillaries.

27.    Dr. Ruan entered into contracts with Company A in or around March 2011.  Dr. Ruan's contract initially guaranteed a monthly payment of $45,000.00 and in 2012 was increased to $53,000.00.  The drugs Company A supplied to PPSA were distributed on-site primarily, and perhaps exclusively, to patients with worker's comp coverage.

28.    Evidence obtained via bank subpoenas shows large checks from Company A were deposited on a monthly basis into bank accounts Dr. Ruan established separately from the general PPSA clinic account.  A review of Wells Fargo account (x1465), in the name of Ruan Companies, LLC, shows deposits totaling $1,005.900.00 from Company A between June 2011 and January 2014.  Bank records show Dr. Ruan is the sole signer on this account.

29.    In early 2014, a former Company A employee whose initials are C.M. created a spin-off company called Company B.  Company B took the place of Company A with regard to supplying the in-house controlled substances to PPSA.  Between January 2014 and August 2014, Company B deposit $262,858.44 into Dr. Ruan's Wells Fargo account (x1465), as well as an additional $115,000.00 into an SB&T account ending in (x5264) that also belongs to Dr. Ruan.

30.    In addition, numerous e-mails in furtherance of this kickback scheme were sent between Dr. Ruan and Company A employees.  The following represent a selection of such e-mails:

31.    On March 11, 2011, right around the time Dr. Ruan and Dr. Couch signed their contacts with Company A, Dr. Ruan, , using the e-mail address xiuluruan@yahoo.com, sent the following e-mail to CM, who at the time of these e-mails was an Company A employee: "*Hi, Chris, thanks!  I will email you the list of drugs that I will use this weekend.  Once we have*

stocked them, I will give the list of drugs to Dr. Couch and have him take a look at them.  I will leave the price and potentials out in case he will pass along the list to his [physician's assistant]."

32.     On April 11, 2011, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, asked CM: "*Also, when do you look at how much we really make each month . . . .?*"

33.     On April 15, 2011, another Company A employee whose initials are L.T. sent the following e-mail to Dr. Ruan at xiuluruan@yahoo.com,: "*We had a great start to the new program launch this week with 120 medications dispensed on site in one day.*"

34.     The following day, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, told LT: "*We really need to get all the CII on stock so that we can avoid the mail order.  As we are telling patients that the major advantages we switch is that we will let them take all meds when they leave.  Also, I am hoping our margins are not affected due to the inability to stock them timely.*"

35.     On July 26, 2011, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, sent an e-mail to CM telling him, "*Hi, _____, can you please make sure that the check be sent to my home address, not Company.  Also, please put it in an envelope saying confidential.  I hate other open it.  This one was opened by other and they saw it!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!*"

36.     On September 26, 2011, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, asked CM: "*Hi, ____, I called you earlier today re: our fee.  So far, we have not received anything more than the guaranteed amount and it has been over 5 months since we started using your service.  Why is there such a delay??  When are you going to do it based on our signed agreement?  Both Dr. Couch and I need an answer!*"

Case 1:15-cr-00088-CG-B   Document 197-1   Filed 09/23/15   Page 11 of 20

37.     On August 23, 2013, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, received the following e-mail from CM:  "*I also wanted to let you know that you received your last guaranteed check (45k) last month.  This month's check is for $41,769 and it should grow quite a bit as the collections build up under the new contract and as we add Cyclo 7.5 and Ultram ER 150 etc where you can.  We are going to make really good money Dr. Ruan!*"

38.     On November 12, 2013 CM told Dr. Ruan at xiuluruan@yahoo.com,:  "*You are dispensing 11.83 bottles per patient.  Some insurance co's have said that's too many per patient and used that to pay less.  We are fighting with the insurance co's to get payment for all charges. We have submitted reconsiderations and will eventually get paid.  The main reason for the drop in the check is that the volume dispensed dropped.  We will work to get paid on every single bottle dispensed to stat you are earning as much as possible.*"

39.     On April 14, 2014, Dr. Ruan, using the e-mail address xiuluruan@yahoo.com, sent the following e-mail to CM: "*You mentioned last week that you were concerned that Zofran got expensive.  The price did go up a bit but it's still a very profitable medication to dispense!*"

40.     On May 5, 2014, CM informed Dr. Ruan**,** "*The cost for LidoPro is $20.99, the AWP is $465.85.  This is a very profitable product.  LenzaPatch.  The cost is $34 and the AWP is $160.*"

41.     On May 22, 2014, CM told Dr. Ruan at xiuluruan@yahoo.com that "*The LenzaPatch cost $34 and reimburse at $160.  Most of our doctors are having their patients use this product at night and the LidoPro cream (Cost $21, Reimburse $465) during the day.*"  The following day, CM noted, "*I misquoted the LenzaPatches . . . they are better than I initially indicated.*"

11

## CONCLUSION

42.     In my training and experience, I have learned that Yahoo, Inc. provides a variety of on-line services, including electronic mail ("e-mail") access, to the public.  Yahoo, Inc. allows subscribers to obtain e-mail accounts at the domain name yahoo.com, like the e-mail account[s] listed in Attachment A.  Subscribers obtain an account by registering with Yahoo, Inc.  During the registration process, Yahoo asks subscribers to provide basic personal information.  Therefore, the computers of Yahoo, Inc. are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Yahoo subscribers) and information concerning subscribers and their use of Yahoo, Inc. services, such as account access information, e-mail transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

43.     A Yahoo subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Yahoo, Inc.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

44.     In my training and experience, e-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account

(such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

45.    A preservation request was sent to the provider. In general, an email that is sent to a Yahoo subscriber is stored in the subscriber's "mail box" on Yahoo's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Yahoo's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Yahoo's servers for a certain period of time.

46.    In my training and experience, in some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

47.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the

13

information stored in connection with an email account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

48.    Further, information maintained by the email provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).

49.    Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

50.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Yahoo, Inc., who will then compile the requested records

at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Amy E. White
Special Agent
Federal Bureau of Investigation

THE ABOVE AGENT HAS ATTESTED
TO THIS AFFIDAVIT PURSUANT TO
FED. R. CRIM. P. 4.1(b)(2)(B) THIS 22nd
DAY OF SEPTEMBER 2015.

U.S. Magistrate
Judge Katherine P.
Nelson

Digitally signed by U.S. Magistrate Judge
Katherine P. Nelson
DN: cn=U.S. Magistrate Judge Katherine P.
Nelson, o=Federal Judiciary, ou=U.S.
Government,
email=efile_nelson@alsd.uscourts.gov, c=US
Date: 2015.09.23 15:14:59 -06'00'

HON. KATHERINE P. NELSON
UNITED STATES MAGISTRATE JUDGE

15

## <u>ATTACHMENT A</u>

**Property to Be Searched**

This warrant applies to information associated with **<u>xiuluruan@yahoo.com</u>** that is stored at premises controlled by Yahoo, a company that accepts service of legal process at 701 First Avenue, Sunnyvale, California.

## ATTACHMENT B

### Particular Things to be Seized

I.      **Information to be disclosed by Yahoo, Inc. (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all e-mails ***beginning on OCTOBER 22, 2014 and ending on the PRESENT DATE***, which are associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.      The types of service utilized;

d.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

      e.       All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II.     **Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of  18 U.S.C. § 1349; 21 U.S.C. § 846; and 42 U.S.C. § 1320a-7b(b), those violations involving Xiulu Ruan, John Patrick Couch, Laura Terranova, Chris Manfuso and others yet identified and occurring on or after March 5, 2011 through the present, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Communications to and from the e-mail address **xiuluruan@yahoo.com** on and after March 5, 2011, through the present.

(b) Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions.

(c) Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address).

(d) Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses.

(e) Information about each communication sent or received by the Account, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers).

3

(f)  The identity of the person(s) who created or used the user ID, including records

that help reveal the whereabouts of such person(s).

(g)  The identity of the person(s) who communicated with the user ID
about matters relating to all transfers of bank funds, including
records that help reveal their whereabouts.

4